We'll hear the first case, Vioni v. Providence Investment. Please be seated. May it please the Court. My name is Corey Stark. I'm here with Sean Dweck, and we have the honor of representing Lisa Vioni in this appeal. This is a quantum Marowit case. Quantum Marowit means as much as deserved. And Ms. Vioni deserves much more than the $750,000 verdict that we received at the trial in this case. That verdict should not have been disturbed. The 20 to 30 percent range was well established at trial. It was repeated. The jury received that information. But not from the person who recruited it. It's from the recruiter that it was well established. Your Honor, there is nothing to support the conclusion that it's any different. There was the testimony. Is there anything to support the conclusion that it's the same? Your Honor, I believe there is. What is it? Essentially, if I were to go to a store, for example, and go to buy a candy bar, and you said, no, no, I'll buy it for you, no one's going to change the price. This is the value of what it is that she got. Is there any evidence in the record that it is a marketplace convention that the applicant pays? Or what an applicant pays? Your Honor, what happened in this situation is that Mr. Jeffrey stepped in and said he would pay. That doesn't change the value of the services. He volunteered to pay because he was desperate to get this deal. What the value of the services is to the recruiter versus the one party versus the other may be quite different. Also, there are considerations of what if any tax benefits one party may be able to claim that the other won't. There are a whole range of questions here that you didn't attempt to answer. Well, Your Honor, in terms of tax benefit, it was Pim and Jeffrey that received the tax benefit. Because what they did is they tried to hide some of the benefit that they received from this deal, the $500,000, an excess of $500,000. I'm not making myself clear. Whether the payment of the fee could be treated as an expense or not, I think results in different answers depending on who's paying this fee. Well, who would have paid this fee is very clear. It would have been Providence Investment Management. It wouldn't have been Jeffrey. The deal was she was engaged by Providence Investment Management, not Jeffrey directly. My question is, have you shown what the value is, what someone in this position would have paid for it? That's the concern. I believe that we have. There is significant evidence to support the 20 to 30 percent range. It was received through Exhibit 169, which is more than 50 executive search contracts. In addition, the 20 to 30 percent range was acknowledged by the court on their remittitor. Is there any evidence in the record of what happens when an applicant pays? There's no evidence in the record that specifically addresses what happens when an applicant pays, but there's no evidence in the record that specifically suggests or any case law that suggests that it's any different. Where did the trial judge, the district judge, Judge Carvey, where did he get in the remittitor, where did he get $150,000? He got it from using the 20 to 30 percent range. He applied the 30 percent range to a reduced amount, because what he did was he excluded the bonus of Mr. Jeffrey and he excluded the PIMM team. He shouldn't have done either. We established at trial that the PIMM team certainly was recruited, and Ms. Vioni was responsible for that in a number of different ways. The case law, though, is quite to the contrary on that point for you. I don't know how you can say that you established that. Well, Your Honor, I'll explain how we established that. The testimony from Ms. Niemczyk and what seemed to be relied upon by the court in the decision was essentially that Ms. Vioni didn't arrange for the interviews. There were no interviews conducted because ACAS wasn't interested in interviews. What they were interested in was record, the record of this team, and who provided them with the information of the record of the team, that would be Lisa Vioni. She first introduced these people to ACAS through their biographies, which she helped edit, and she provided to ACAS. In addition, like I said, there were no interviews whatsoever. What they wanted was the performance record. The person that provided ACAS with the performance record was Lisa Vioni. She also provided ACAS with the mechanism to compare that performance record against performance records of other teams. So she is individually responsible, and she actually performed services that a typical recruiter could not do. And what is probably most important about that is the testimony of Ms. Niemczyk, which relied on the fact that there was no interviews or that the interviews were not arranged by my client. She didn't even know that no interviews were conducted. She was asked that question specifically at trial, and she had no idea that no interviews were conducted. But the case law that I'm pointing you to is precedent that is basically held that we're a search consultant, as in Ms. Vioni's case, consults only one team member, the team leader, who brings other members of his team to the hiring institution. That's not a circumstance where the recruiter gets a percentage of all of their salaries. But that's not what happened, Your Honor. What happened was Ms. Vioni was provided with the materials, and she edited and provided the biographies of each of these people. She actually introduced them. She arranged the meeting. She introduced all these people, all the team members, to ACAS. Well, she didn't provide the biographies. As I understand the record. That's not accurate, Your Honor. What else did she do? She also provided the performance record of this team and compared. Right, the team. Her dealings were only with Mr. Jeffries, right? And he sent her materials, and then she passed them on. That's not true. Tell me what I'm not seeing. There were a number of members of the team that were actually at that initial meeting with ACAS. It wasn't just Ms. Vioni and Mr. Jeffries. There were some members, not the entire team. The point is she didn't put the team together. Mr. Jeffries did, and that's what I understood was she deals with the team leader. He brings along his team. That gets her the benefit of his salary. Not everybody else's. Your Honor, the jury specifically asked to have Ms. Niemzik's cross read back and specifically highlighted the fact that Exhibit 169 were the biographies of these people. She didn't just provide them. She helped write them. Why shouldn't they pay part of it rather than just one of them? They should, Your Honor. That's our position, that the team hire, all of them should be responsible for it. And what happened in this situation was they're not all defendants. But what happened in this situation is that ACAS paid all of their wages for PIM. So they continued to do the same job they were doing before and work for ACAS at the same time. ACAS then paid their wages. So the benefit actually was, to address your question, was for PIM. They got the benefit of free labor out of this deal. They didn't pay bonuses. They didn't pay wages out of this deal. We tried to provide that information to the jury, and Judge Crotty would not permit us to. So who should pay? The acquirer of PIM should be paying that money? Providence Investment Management and Jeffrey. Because Jeffrey has 100 percent control over PIM, and PIM received the benefit of free labor and free rent. Over $320,000 in free rent. Because my time is running. Because the bonus was contingent, and I thought that was the basis for the district court excluding that. Well, it's not clear exactly what the jury did, Your Honor. There's a number of different ways that you can look at how the jury reached their conclusion. If they included the bonuses, then they only awarded Ms. Vione 22 percent. They could also have reached their $750,000 number by including Jeffrey's base, Jeffrey's bonus, and just the base of the team members, and that would have gotten them to 31 percent, which is within the range. And actually within the range of the contracts that were submitted in the exhibit. I believe it was 169, which is all of the contracts. But if the court concludes that this is important information, then preclusion should have never occurred. The case law in preclusion is very clear that preclusion should be only a last resort, and lesser remedies should always be considered. There's no doubt that this was an act of malpractice. My predecessor got an order, didn't follow the order because he assumed by filing a writ of mandamus with this court that the case was stayed, which it wasn't. He then, not until he found out from my opposing counsel that the case wasn't stayed, then he takes the emergency. Was he the trial lawyer? No. He got terminated because he committed malpractice. Myself and Mr. Dweck were the trial lawyers. We got the case about a month before trial. There was a real problem, wasn't there, in terms of your expert witness? There was a real problem, and that's part and parcel and can't be separated from the malpractice. So Mr. Carey did nothing to prepare this case for trial. Three days before... It's his insurance company that ought to be paying this rather than... He doesn't have insurance, Your Honor. And Judge Cronin decided that Ms. Vioni should bear the responsibility for the acts of her lawyer, and that is directly at odds with the decisions of this court in Dodson, Worldwide, Pichardo, and Charles. All of those cases, the determination of this court was if it's an act of sloppiness or negligence by the lawyer, then the plaintiff or the individual that's represented by the lawyer should not be punished for those acts. Judge Cronin ignored that case law and actually says that it's Ms. Vioni's problem because she decided to hire him, and then recently, in 2018, in the Omega case, he says it's not appropriate to impose sanctions on the plaintiff for the actions of their counsel, which is consistent with the decisions of this court, but directly at odds as to what he did in this case. There was an easy remedy. He could have... The alleged prejudice, Your Honors, was that we got the opportunity to review Ms. Niemzik's report for an extended period of time, and there was going to be additional cost. The expert testified that he never saw the report. This report that he prepared was based upon what Mr. Carey provided to him, and that's it. He didn't read it. He says he didn't sign it, and he never saw Ms. Niemzik's report. The remedy... I'm sorry. Go ahead. Finish your thought. The remedy that was available and would have satisfied everything was to sanction Mr. Carey for his actions. I know your red light is on, but I'm going to ask the presider to let me ask one more question. Sure. A lot of what we've been talking about here suggests that your client may have been entitled to some compensation on a qualitative value of quantum error, but instead the only charge that was given was on marketplace conventions, and you did not object to that or seek a qualitative value theory charge. So I'm not sure how we could say that you're entitled to the full amount on a qualitative value theory when that's not what went to the jury. Unfortunately, Your Honor, we couldn't put that to the jury because Judge Crotty prevented us from providing evidence of qualitative value. He stood in our way at every point to provide that, but I will tell you that there is evidence, some evidence of qualitative value. You argue that he excluded evidence, and we can decide whether that was error or not, but if we don't find that in your favor, how can you urge us to affirm this verdict or to uphold the verdict on a qualitative value theory when you didn't submit it to the jury on that theory? Well, we wouldn't, we weren't permitted to go too far into any qualitative value, but I can tell you that there was evidence of qualitative value. The evidence of the qualitative... You didn't go to the jury on that theory, though. But I'm confident, Your Honor, that the jury considered that, and they considered the fact that Jeffrey and Pim were desperate for this deal. They considered the extensive work that Ms. Vioni did. She made two introductions, two-pointed introductions. She arranged for the teleconference and the meetings. You don't have to go over this again. You're telling me that you think even without a charge it can be upheld on a qualitative value theory. I believe so because Mr. Jeffrey and Pim made tens and tens and tens of millions of dollars off this, and Judge Crotty decided... It has nothing to do with what the value of her services were. Your Honor, Judge Crotty decided that nothing with respect to the quality of her services or the quantity of her service should be considered by the jury, and I would also submit to you that my adversary tried to discuss or did discuss that in his opening during the trial and in the closing, and we were prevented from putting evidence in that. No appellate challenge to the charge, right? That's correct, Your Honor. All right. You've saved some time for rebuttal. We'll hear from the other side. Thank you. May it please the Court. Neil Klausner from Davis and Gilbert with me today are my colleagues Jacqueline Smith and David Greenberg, and I would also like to introduce you to Russell and Rich Jeffrey who are with us behind me. This is a quantum... Can I have a preliminary question? Of course. Unrelated. It's a diversity case, and I notice that three of the defendants are LLCs. There are only two defendants remaining in the case. Well, I'm worried about diversity. Yeah, sure. At the outset of the case, as I have the complaint in front of me, there were three LLCs, and LLC has the citizenship of all of its members. It's not alleged, and I just want to make sure. I mean, I'm reluctant to raise this after 10 years of litigation, but do you know whether any of the members of the LLCs were Florida citizens or entities? Not to my knowledge, Your Honor. Okay. All right. Go ahead. Thank you. So this was a quantum Meriwit case, a 10-year-old case. I might add the longest litigation of my career, and for 10 years, Ms. Vioni had the opportunity to develop the reasonable value of her services based on a quantum Meriwit theory. There was no agreement between the parties to compensate her. So this boiled down to reasonable value, which the case law says, for the most part, is an hourly rate times the amount of time somebody provides the services. However, there is an exception. If the plaintiff can establish by, quote, clear and accepted marketplace conventions that the defendant would normally compensate the plaintiff for the service provided on a different type of basis, then she can opt to pursue that theory of damages, and that's what Ms. Vioni did in this case. She never offered evidence of the number of hours she worked or the reasonable value of her time. I got it. That's correct, Your Honor. She certainly had the opportunity to do that, and she did not pursue that standard remedy. Did she try? Did she ever try to? She did not. Okay. Instead, she opted to ‑‑ well, she originally, an important fact in this case, is she originally sued American Capital as well as Mr. Jeffrey and Providence Investment Management, and she did seek the same compensation from the hiring institution for the placement of Mr. Jeffrey and his colleagues. When that party was dismissed from the lawsuit, she pursued that type of compensation from Mr. Jeffrey. Previously, she had been suing Mr. Jeffrey primarily for what was called a marketing fee on the misunderstanding that she had ‑‑ American Capital had invested in Mr. Jeffrey's hedge fund or had acquired Mr. Jeffrey's hedge fund and that she should be compensated based upon monies that went into those hedge funds. That turned ‑‑ I understand the plaintiff's position. Yes. The argument is that Mr. Jeffrey's having agreed that she would be paid and the district court having found sufficient factual basis to allow that finding, that the parties expected that she would be paid, that it's a reasonable conclusion that she would be paid by whomever what the market generally compensated for this. So, yes, the compensation usually comes from the hiring party rather than the applicant, but where the applicant says, well, I'll pay you, the expectation would be that they'd pay what the market provides that a hiring person would pay. Why shouldn't we allow that conclusion to control here? Well, several responses. First, the assumption of that question is that there was an agreement to pay and there was no agreement. The breach of contract case was dismissed from the outset. No, but what the district court said was the evidence was sufficient to show that the parties understood that she expected payment. She expected payment. And so the question then was, could she establish the reasonable value of services that she provided to Mr. Jeffrey? And she said, I intend to do that based upon clear and accepted marketplace conventions of what a candidate would pay a recruiter in this situation, and I'm going to be able to do that, she said. Through my own testimony, through the testimony of defendant's expert witness, and through documents that I'm going to introduce in this trial. Her own testimony never materialized. While she said she was going to talk about her own experience being paid by others that she had placed during her career, she never did testify about that. She mentioned that she had one encounter with another person in the financial services industry who she got a job for, but she never said whether she was paid for that or so what the amount was. The documents that were just cited about these executive recruitment contracts came out of American Capital's files, and they were American Capital's contracts with recruiters, which said American Capital, the hiring institution, alone would pay the recruiter. They called on their affirmative case the director of HR at American Capital, and she said in no circumstance would a candidate ever pay and never did pay under any of these contracts. And finally, and perhaps most importantly, the only expert witness who testified at the trial, Jill Nimsek, 20 years as an executive recruiter in the financial services business, had been involved with thousands of hirings and placements of candidates. She testified not a single instance in her career has a candidate ever paid that the marketplace convention, put aside that there is no clear and accepted marketplace convention for a candidate to pay, the clear and accepted marketplace convention is that the hiring institution would pay. There was no evidence in the record of any case where a candidate paid? None whatsoever. There was an absence of any evidence, not a single document, no testimony that a candidate would ever pay. So this is an equitable remedy. The jury certainly found that she deserved something. Why, you know, shouldn't a court of equity be required to consider the overall fairness of it and let a jury, I mean, how is this different from what is a broken arm worth or a lost eye? Well, that's not the way this case was presented to the jury. It was presented as a case where under marketplace conventions, the candidate ought to compensate the recruiter. It was never presented based upon some sort of general equity, and I'm not aware of any case law that would give the jury that type of discretion without any type of charge or evidence as to how they would make that conclusion. If I understood the start of your argument when you stood up, the suggestion is that if she wanted that relief, she had to put in the hourly rate and something that would have suggested what the value of her work was regardless of who was paying. Is that what you're saying, that you wouldn't be able to dispute the equity of awarding her some kind of hourly rate? I said that that's generally the standard of determining reasonable value is the hourly rate times the amount of time spent providing a service. That was never a theory in this case. I asked your adversary, which is where did the $150,000 remitter amount come from and why not? I mean, why doesn't that make sense? Well, first, it's based upon, Judge Crotty based that upon the assumption that this court determines that a candidate would pay the same amount as a hiring institution and reversed his holding otherwise. If the case was reversed on that basis and sent back to him, he found that the only evidence in the case of what the hiring institution would pay is a percentage of the first year salary of the candidate for whom is the only place. Just Mr. Jeffrey. And it was just Mr. Jeffrey's $500,000 first year salary. It was based on what he would have been paid had the acquirer been doing the pay. That's correct. It was approximately 30% of his $500,000. That's where that number comes from. Am I right in understanding that one of your arguments, albeit in the alternative, is to affirm the district court order giving her the choice between remitter and new trial, right? Is that what you're appealing for? Sure. I mean, our primary argument on this appeal is that you ought to affirm Judge Crotty's judgment as a matter of law. And as he is required to do when he grants that motion, he also decided in the alternative that he would grant a new trial due to a miscarriage of justice. I think you hear from our questions that there may be some disquiet in concluding that the plaintiff is entitled to nothing, even if there's persuasive effect to your argument that on a market value theory, she didn't show what the conventional market price by an applicant would be. Do you have any way to assuage that disquiet? Several responses, Your Honor. One is, as we've been saying from the outset, American capital, if there was a party that should be paying her, it was American capital. And that party was dismissed based on a statute of frauds basis. But they were the hiring institution that should have paid her for her time. Two, as Judge Sachs suggested, there is a remedy against the prior lawyer if she feels there was malpractice in the way she presented her case here. And she has, in fact, filed that lawsuit and has been prosecuting it for five or six months now. And so that is an opportunity. But I take it rather simply. I mean, like a billiard table, your principal relief you would like is an affirmance. What you would like, well, if that's not so good, how about $150,000 remitted? If that's not so good, then $750,000, but certainly no more than that. I mean, the less money, the better, right? Well, we think an affirmance of a judgment as a matter of law is the right result here since the plaintiff failed to prove an essential element of her prima facie case, and that is the reasonable value of services that my client ought to be responsible for. She had all the opportunity to do that, and she defeated our motion for summary judgment on the basis that she was going to do that through certain evidence that just never materialized at trial. If there is a remitter, sure. As I just described, I think Judge Crotty, his calculation of the $150,000 is accurate. We think the jury's verdict was a substantial miscarriage of justice, as Judge Crotty found. I would like, if I could just briefly mention this, the preclusion issue. Judge Crotty actually goes through some detail in his separate decision on precluding an expert on the Patterson factors about how to determine whether preclusion under Rule 37 is okay and the lack of a reasonable explanation for missing a deadline, the importance of the testimony, the prejudice to my client, and the continuance of trial for a 10-year-old case. He analyzed properly about why preclusion would be appropriate in this case. But moreover, as the briefs already lay out in detail, the expert who was precluded here never actually prepared or signed an expert report, and for that basis alone, the witness should not have been permitted to testify. And I think Ms. Vioni's papers before this Court acknowledges that that witness would have been unsalvageable was her language. Thank you, Your Honors. Thank you. We'll hear the rebuttal. Mr. Klausner referred to their motion for summary judgment. That was summary judgment motion number three. That was briefed within a week before trial, and we were handicapped because we had no expert. We're handicapped in this trial with no expert. We would eagerly receive as a remedy a new trial with an expert, and if we had a trial with an expert, we wouldn't be here before this Court. We heard counsel suggest that the expert report was not signed, that there were other problems. I mean, are you ascribing the lack of expert as an error that this Court should correct, or are you just telling us this as a fact in the case? Your Honor, that's all part of the malpractice. This attorney— That's not our concern. Well, it is a concern based upon the case law. The case law suggests that if it's an attorney's error, the remedy or the sanction should not be imposed upon an innocent plaintiff, and this is a case— There are grounds for error in the trial that gets you a new trial. We didn't get an expert at the trial because of the malpractice that occurred before the trial. Tell me what precedent allows us to reverse a judgment on the grounds that the lawyer engaged in—the retained attorney engaged in malpractice. Your Honor, there are a number of cases, Second Circuit cases, Dodson, Worldwide, Polliners, Pichardo, and Charles, that all— and this is all a pretrial issue. We raised this issue in multiple motions. We requested that we apply the Patterson factors, that if you apply the Patterson factors, we would have had an expert at trial. The only cases that—one case cited, too, by my adversary is Beers. The plaintiff withdraw two of the experts? We had to withdraw two of the experts, Your Honor, because they weren't responsive. They were rebuttal experts. They weren't responsive to the expert report of Ms. Niemczyk. There was a motion to preclude them, and this is all part— It was malpractice to withdraw them, is what you're saying? No, it was malpractice to have them submitted. What Mr. Carey did is the day—essentially the day, the Friday before the Monday that these were due, he realized that he had committed malpractice and thought the case was stayed. He then prepared three expert reports and submitted them on a timely basis. Unfortunately, two of them were not responsive to the original expert report, and one of them wasn't signed, wasn't read, and the expert report that he was responding to, he testified that he never saw it. That's all the malpractice. But I just want to address very quickly— But the argument you make in your brief, and I'm now looking at page 48, is you're saying defendant would not have suffered prejudice if the district court had allowed plaintiff's experts. Correct. And so the error you're complaining about is preclusion, not malpractice, the district court's preclusion. And in light of what your adversary has said, what preclusion was erroneous here? What expert testimony could you have offered? Well, Your Honor, when we got into the case, which was about a month before trial, we made a motion for an extension of time to submit an expert recognizing that Mr. Cary had committed malpractice. That was denied on February 2, 2017. We renewed that application. Judge Cary— The judge has lots of discretion about that, and you don't complain about not getting an extension. I'm asking you what expert you could have put forward that you were precluded from putting forward because that's the error you complain about in your brief. Your Honor, we could have put forward Mr. Warren, but he would have reviewed the expert report before. But he wasn't—in short, you hadn't complied with the rules of civil procedure on that expert. My predecessor did not because he mistakenly thought the case was staged. You are in the shoes of your predecessor here. To the extent you're complaining of district court error, I want to know where you think the district court erred in not allowing you to put on an expert because the district court can't have erred if you didn't comply or your predecessor didn't comply with the rules. Certainly, Your Honor. And this court has ruled a number of times that the district court abused its discretion by not giving an extension when it was the attorney's problem and sloppiness not— In your brief, you complain about an extension where? Because as I said, I just reread pages 48 and 49 about experts, and there's no mention there about not getting an extension. Your Honor, it's specifically addressed in my brief when we cite to the decisions of— Which page? Give me two seconds. I'm sorry, Your Honor. We cite to the decisions of February 6th, February 24th, March 2nd— Which page is this argument made that your failure to get an extension is an error warranting a new trial? Your Honor, if you look at the reply brief, it's specifically—I specifically address the issue of these decisions. I'm asking this question because it wasn't apparent to me that that was the argument—that that was the error on which you were seeking relief. And if it was raised for the first time in a reply brief, we're not required to consider it. I don't want to hold up the panel, but— Your Honor, it wasn't raised for the first time in the reply brief. It's specifically addressed at— Which page? She's asking about in here. Your Honor, if you look in the record A49, there's a specific request in the appendix. During your brief, is this cited as an error? The record may show all kinds of things. If that's not the error you're arguing on appeal, I don't know how we address it. Page 2. Did the district court err in precluding evidence about—excuse me. Page 2. Page 2. Number 5. Did the district court err by denying plaintiff leave to serve affirmative expert reports after her prior attorney missed the deadline as a result of malpractice? Right. And this is then argued in what point? Because I thought that it was only the point of page 48. I'm willing to see that it's somewhere else if it is somewhere else. Your Honor, it's addressed in point 3, starting at page 40. Thank you. Sorry. I'll review that. Thank you. Thank you, Your Honor. Thank you. We'll reserve decision. The presider will allow you to read that piece of yellow paper that's been fluttering in front of your face now for five minutes. I'm sorry. My co-counsel wants me to make sure that I point out that my client, and this is at odds with the decisions of the Second Circuit, is being punished for her attorney's mistakes. We've heard that. I think you've made that point.  Thank you. Thank you, Your Honor.